KNIGHTS OF COLUMBUS COUNCIL # 3660, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 84–3007.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 20, 1985.

Decided Jan. 31, 1986.

John J. Rochford, Indianapolis, Ind., for plaintiff-appellant.

David I. Pincus, Dept. of Justice, Washington, D.C., for defendant-appellee.

Before WOOD, Circuit Judge, FAIRCHILD, Senior Circuit Judge and GORDON, Senior District Judge.[*]

MYRON L. GORDON, Senior District Judge.

The Knights of Columbus Council # 3660 (the Council) appeals from the district court's grant of summary judgment in favor of the United States, rejecting the Council's claim for a tax refund. The district court ruled that revenues the Council generates by conducting drawings open to the general public are subject to the wagering excise and occupational taxes, 26 U.S.C. §§ 4401 and 4411(b), by virtue of 26 U.S.C. § 4421(2)(B). It also ruled that the government is not estopped to assess the taxes retroactively back to 1972. We affirm.

The Council has conceded throughout this litigation that if it is subject to the wagering excise tax under 26 U.S.C. § 4401, then it is also subject to the related occupational tax under 26 U.S.C. § 4411. We thus refer, where appropriate, to the wagering excise tax alone, without mentioning the occupational tax.

The Council is a fraternal society exempt from federal income tax under 26 U.S.C. § 501(c)(8). To defray operating expenses, the Council has conducted weekly and monthly drawings since 1955 at its Indianapolis, Indiana, headquarters. Tickets for these drawings are sold to the general public by independent agents, who receive a 25%–30% commission on their sales. Winners are determined by the random drawing of peas from a bingo cage which bear letters and numbers corresponding with the letters and numbers printed on the tickets.

For its fiscal years 1973 through 1980, the Council's drawings generated annual gross receipts averaging $826,790.39, or approximately 71.5% of its average annual gross receipts from all sources combined. For the fiscal years 1970 through 1979, the average annual net proceeds generated by the drawings was $63,888.89, or approximately 46.5% of the Council's average annual total net proceeds. Because the revenue derived from membership dues alone was insufficient, the Council used proceeds from the drawings to defray club operating expenses and to subsidize membership activities, recreational and social functions.

Between 1955, when the drawings began, and the commencement of this litigation, the IRS audited the Council three times. Following audits conducted in 1960 and 1972, the IRS did not assess any wagering excise tax against the proceeds of the Council's drawings. Following a 1977 audit, however, the IRS notified the Council in February 1978 that it was liable for the wagering excise and related occupational taxes from and after 1972. In April 1979, the IRS issued a technical advice memorandum to the same effect. After the IRS assessed part of the tax then due in April 1980, the Council paid that assessment and began this refund action.

We turn first to the application of 26 U.S.C. § 4421(2)(B) to the Council's wagering activities. That section excludes from the operation of the wagering excise tax the proceeds of "any drawing" conducted by a section 501 exempt organization, provided that "no part of the net proceeds derived from such drawing inures to the benefit of any private shareholder or individual." Citing *Edgewood American Legion Post No. 448 v. United States*, 246 F.2d 1, 5 (7th Cir.1957), the district court found that the Council's drawings are regular, not occasional, and therefore not the type of wagering activity entitled to benefit

---

[*] The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

from the § 4421(2)(B) exclusion. It also found that the reduced membership dues which resulted from the Council's use of drawing proceeds to defray operating expenses and subsidize membership activities inures to the benefit of individual Council members within the meaning of § 4421(2)(B).

■ Where a section 501 exempt organization raises substantial revenue by engaging in profitable transactions with the public over a long period of time, inurement is established under § 4421(2)(B) even though the earnings so derived are not distributed directly to the membership. *Rochester Liederkranz, Inc. v. United States,* 456 F.2d 152, 155–56 (2d Cir.1972), citing *Jockey Club v. Helvering,* 76 F.2d 597, 598 (2d Cir.1935). However, where participation in the revenue-raising activity is limited to members of the tax exempt organization, the financial resources generated by the activity and used to support the organization "are merely shifted between members of such a group, and no tax consequences attach to that shifting." *Pittsburgh Press Club v. United States,* 579 F.2d 751, 761 (3rd Cir.1978), citing *McGlotten v. Connally,* 338 F.Supp. 448, 458 (D.D.C.1972) (three-judge court). The court in *Rochester Liederkranz, Inc.* explained this distinction:

> The reason for finding inurement when the club derives profit from public involvement in its activities but not when it raises revenues from activities restricted to members is obvious. In the former case the public helps pay for the club's operations, a clear benefit to the private shareholder, while in the latter the members continue to bear the costs of the club's operations, in the same way they do when paying dues.

456 F.2d at 156

A limitation on the exclusion from the wagering tax provided in § 4421(2)(B) is consistent with the interpretation given the inurement clause found in § 501(c)(7) of the Internal Revenue Code. Section 501(c)(7) provides an income-tax exemption to "[c]lubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder." In *Pittsburgh Press Club, supra,* 579 F.2d at 761, construing that section of the code, the court found it "obvious" that where a club derives substantial income from nonmember sources, such outside revenue "is used to benefit members since [it] permits the club to assess lower dues than would otherwise be required to support the club's facilities and operations."

■ We are convinced that inurement is present under the undisputed facts of this case. The Council carried on substantial profit-making transactions with the public for a long period of time. In the 1970's, the drawings generated gross income averaging over $800,000 per year and net income averaging almost $64,000 per year, or 46.5% of the Council's total yearly net income. Without this income from its substantial public-ticket sales for the general operation of the organization, Council members doubtless would have to pay higher membership dues or see the quality and quantity of membership benefits and services substantially reduced. It is thus evident that the net proceeds of the Council's drawings inure to the benefit of the individual members of the Knights of Columbus Council # 3660, 26 U.S.C. § 4421(2)(B), and that such proceeds do not qualify for the wagering tax exclusion under the circumstances present in this case. *Rochester Liederkranz, Inc., supra,* 456 F.2d at 155–56; *see also Pittsburgh Press Club, supra,* 579 F.2d at 761.

The Council also contends that the government should be estopped to assess the taxes in this case or, alternatively, estopped to assess them retroactively back to 1972. It argues that the government's failure to find the Council liable following audits conducted in 1960 and 1972 led it, in good faith and to its detriment, to rely on the IRS' acquiescence in the non-taxability of proceeds derived from its drawings. According to the Council, the questions

whether its reliance was reasonable and whether the Commissioner of Internal Revenue abused his discretion by not limiting the retroactive effect of his assessment under 26 U.S.C. § 7805(b), are genuine factual issues not amenable to summary judgment.

■■■ The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of an error of law. *Dickman v. Commissioner of Internal Revenue*, 465 U.S. 330, 343, 104 S.Ct. 1086, 1094, 79 L.Ed.2d 343 (1984); *Automobile Club of Michigan v. Commissioner of Internal Revenue*, 353 U.S. 180, 183, 77 S.Ct. 707, 709, 1 L.Ed.2d 746 (1957). Thus, although the Commissioner may have condoned or accepted the erroneous treatment of certain items in previous years, "he is not precluded from correcting that error in a subsequent year." *Hawkins v. Commissioner of Internal Revenue*, 713 F.2d 347, 351–52 (8th Cir.1983). The government may correct such legal errors and may do so retroactively even where a taxpayer may have relied to his detriment upon the error in question. *Dickman, supra,* 465 U.S. at 343, 104 S.Ct. at 1094; *Dixon v. Commissioner of Internal Revenue*, 381 U.S. 68, 73, 85 S.Ct. 1301, 1304, 14 L.Ed.2d 223 (1965).

■■■ The question whether any part of the net proceeds of the Council's drawings inures to the benefit of individual Council members was purely legal. It raised no factual issue or dispute of any character arising under the tax laws. As indicated, the government "is empowered retroactively to correct mistakes of law in the application of the tax laws to particular transactions." *Dixon, supra,* 381 U.S. at 72, 85 S.Ct. at 1304. Thus, the government's failure to assess the wagering tax in this case against the Council following two earlier audits, one in 1960 and one in 1972, does not prevent assessment of the tax back to 1972 following a 1977 audit which found that such assessment is appropriate. This is true even if the government's asserted acquiescence may have caused the Council detrimentally to rely in good faith on the correctness of treating drawing proceeds as non-taxable income. *See Dickman, Dixon,* and *Automobile Club, supra.*

■■■ We note, however, that the record in this case does not actually support the Council's claim of detrimental reliance on the theory of governmental acquiescence. *See Quinn v. Commissioner of Internal Revenue*, 524 F.2d 617, 623 (7th Cir.1975). There has been no prior judicial ruling or official agency action of any kind favoring the Council's narrow construction of the inurement clause found in § 4421(2)(B). Thus, this is not a case in which the party opposing a tax assessment can be said reasonably to have relied upon the IRS' explicit acquiescence in or tacit approval of a rule stated in a case "which it is now believed is incorrect." *Quinn, supra,* 524 F.2d at 623. The Council may not legitimately claim detrimental reliance based upon claimed governmental approval of the manner in which the tax matter was handled pursuant to its filing of a signed return. *See id.*

■■■ Even assuming that the Council can be said to have detrimentally relied on IRS acquiescence, the government did not abuse its discretion by failing to give its assessment prospective effect only. The absence of notice to the Council before 1972 that the government had changed its position regarding the taxability of proceeds derived from its drawings is insufficient to establish abuse of discretion "because the taxpayer [is] not justified in assuming the Commissioner would not make such a change." *Wisconsin Nipple & Fabricating Corp. v. Commissioner of Internal Revenue*, 581 F.2d 1235, 1238 (7th Cir. 1978). Thus, neither a taxpayer's reliance on the government's silence nor good faith requires the government to exercise its discretion to make a ruling prospective only. *Wisconsin Nipple, supra,* 581 F.2d at 1239.

■■■ The Council's challenge to the constitutionality of the wagering tax as violative of the rights reserved to the states under the tenth amendment is without mer-

it. The statutory framework for the assessment, collection, and refund of wagering taxes provides no basis for a broad constitutional attack on that tax. *See Lucia v. United States*, 474 F.2d 565, 577 (5th Cir.1973). The provisions of 26 U.S.C. §§ 4401 and 4411 "are adapted to the collection of a valid tax." *United States v. Kahriger*, 345 U.S. 22, 31, 73 S.Ct. 510, 514, 97 L.Ed. 754 (1953).

Moreover, *Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), and *Grosso v. United States*, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968), upon which it relies, lend no support to the Council's contention that the statutes imposing these taxes are unconstitutional. Those cases hold only that a person cannot, on proper invocation of his fifth amendment privilege against self-incrimination, be criminally convicted for failure to pay the taxes. *See Collins v. Daly*, 437 F.2d 736, 739 (7th Cir.1971).

For the foregoing reasons, the judgment of the district court is

AFFIRMED.